# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### April 22, 2010 Session

## JOANNE ALICE BROWN STAGNER v. PHILLIP WAYNE STAGNER

**An Appeal from the Chancery Court for Tipton County**
**No. 24211    Martha B. Brasfield, Chancellor**

_____

**No. W2009-01749-COA-R3-CV - Filed September 23, 2010**

_____

This is a divorce case involving the classification and distribution of marital property. The parties purchased three contiguous lots near the husband's parents in Kentucky, intending to move there after the husband's retirement. The husband's parents financed the purchase of the property. Several years before his anticipated retirement, the husband began building a house on one of the lots. After some time, the wife told the husband that she did not want to move to Kentucky. The parties then transferred title on all three lots to the husband's parents in satisfaction of their debt. Subsequently, the husband completed the construction of the house, and his parents sold the house at a profit. The husband's parents then sent the husband a check in the amount of the proceeds from the sale of the house minus the parties' debt to the parents. The husband's parents retained title in the other two lots. Soon after that, the parties filed cross-petitions for divorce. In the divorce decree, the trial court held that the check paid to the husband constituted marital property, and that the other two lots held by the husband's parents were subject to a resulting trust in favor of the husband and the wife. The trial court also awarded the wife rehabilitative alimony and a percentage of the retirement benefits received by the husband after the divorce petitions were filed. The husband now appeals. We reverse the trial court's imposition of a resulting trust over the two lots held by the husband's parents, and affirm the remainder of the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is**
**Affirmed in Part and Reversed in Part**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Frank Deslauriers, Covington, Tennessee, for the appellant, Phillip Wayne Stagner

Thomas D. Forrester, Covington, Tennessee, for the appellee, Joanne Alice Brown Stagner

## OPINION

Plaintiff/Appellee Joanne Alice Brown Stagner ("Wife") and Defendant/Appellant Phillip Wayne Stagner ("Husband") were married in 1984.[1] In May and June 2006, the parties filed cross-petitions for divorce. The issues in this appeal involve only the classification and division of marital property and alimony. Therefore, our factual summary will focus on the facts relevant to those issues.

## FACTS

Husband was born in Kentucky, and Wife was born in Florida. Husband was employed with the Navy from 1983 until his retirement in June 2005, and as a result, the family frequently moved. During the marriage, Husband obtained a bachelor's degree and two master's degrees, one in business administration and a Master of Arts in computer information systems. Prior to the marriage, Wife graduated from college with a degree in elementary education and special education. Wife held various jobs during the marriage, but the family's frequent relocations made it difficult for her to maintain consistent employment.

Husband's parents, Frank C. Stagner and Wilma J. Stagner (collectively, "the Stagners"), live in Kentucky. On April 28, 2001, Husband and Wife purchased seventeen acres of property, comprised of three contiguous lots, in Bowling Green, Kentucky, near the Stagners' home. The total purchase price of $32,000 was divided among the lots in this way: Lot 17 ($16,000), Lot 18 ($8,000), and Lot 19 ($8,000). The property was purchased with the intent that Husband and Wife would build a home on the property and eventually move there when Husband retired from the Navy. Though Husband and Wife took title to the property, the Stagners financed the purchase.[2] The parties agreed to pay the Stagners 5% interest on the loan, which amounted to approximately $500 per month. At some point, the parties apparently stopped making these interest payments. Husband and Wife did not enter into a written agreement with the Stagners, and the Stagners did not have a written mortgage on the property. Mr. Stagner, however, kept records of the amounts owed to him by Husband and Wife.

---

[1]The parties had two children during the marriage, a daughter born in 1991 and a son born in 1993. The issues in this appeal do not involve the parties' children.

[2]Though the parties describe this loan as being from Mr. Stagner alone, it is apparent from the record that the loan was from both of Husband's parents. Also, the check made out to Husband that is at issue in this appeal was written on the Stagners' joint account. Therefore, in this Opinion, we refer to the parties' dealings with Mr. Stagner as are inclusive of Mrs. Stagner as well.

At the time the Kentucky property was purchased in 2001, the parties were living in Georgia. In 2002, the parties moved to the military base in Millington, Tennessee.

After the family moved to Tennessee, the parties began construction of a house on Lot 19 of the Kentucky property. The Stagners paid substantial amounts toward the construction of the house, and the parties contributed some of their own money as well. In his spare time, Husband did much of the labor on the house construction. He frequently traveled to Kentucky on weekends or during his vacations or on holidays to work on the Kentucky house, while Wife stayed home in Tennessee with the parties' two children. Occasionally Wife and the children would accompany Husband and work on the construction of the house. Husband and Wife and the Stagners all agreed that the Stagners' financing of the house project was temporary; all intended for the Stagners to be repaid in full for the amounts that they paid for the property and for the materials to construct the house.

Although Husband at all times wanted to move the family to the Kentucky house after his retirement, Wife was ambivalent about the idea. There is some dispute about whether Husband purchased the property without discussing it with her. Over time, the parties began experiencing marital difficulties. As Husband's retirement date approached, Wife became certain that she did not want to move to Kentucky.

The parties' marital difficulties made the Stagners insecure about whether they would be repaid for the substantial monies they had loaned to the parties. At the same time, the parties were experiencing financial difficulties. Husband met with Mr. Stagner, who presented the parties three options: (1) deed the property back to the Stagners, (2) put the property up for auction in a "master commissioner's" sale, similar to a foreclosure, or (3) obtain an outside mortgage. Wife did not participate in the discussions with Mr. Stagner about the options.

In April 2005, Wife purchased a house in Munford, Tennessee, solely in her name. Initially, both of the parties and the children moved into the Munford home. When Husband retired in June 2005, he spent most of his time living in Kentucky to complete work on the house on Lot 19. During this time, Wife financially supported herself and the children.[3] This remained the situation until the Kentucky house was substantially completed in October 2005.

In May 2005, Husband arranged for him and Wife to meet with three elders at the parties' church, the Bartlett Church of Christ, to seek the elders' advice on their marriage problems and what to do about the Kentucky property and the debt owed to the Stagners. After the meeting, the parties decided to deed the property back to the Stagners. By that time, the

---

[3]Husband alleges that he contributed to their support during this time period.

parties had substantial equity in the property because of the newly constructed house on Lot 19. However, at that time, the parties did not discuss the ownership of this equity or what would happen to it if the property were deeded to the Stagners.

Soon after the meeting with the elders, on May 16, 2005, the parties transferred all three of the Kentucky lots to the Stagners. Upon the transfer, the Stagners apparently cancelled the parties' debt.[4] No money actually changed hands when the property was deeded from Husband and Wife to the Stagners. Nevertheless, the deeds reflected that the consideration for the transfer was the original purchase price of the lots: Lot 17 - $16,000, Lot 18 - $8,000, Lot 19 - $8,000.

After the transfer, Husband spent several months in Kentucky finishing up the house to prepare it for sale. The completed house on Lot 19 was listed for sale in November 2005. In January 2006, a purchaser placed a contract on the house. The sale was closed on March 9, 2006, for a purchase price of $330,000. Lots 17 and Lot 18 were not included in the sale, so the Stagners retained ownership of these two lots.

On March 13, 2006, a few days after the closing, the Stagners sent Husband a check payable to Husband in the amount of $168,177.62. The check stated in the "memo" line that it was for the "sale of house." Husband put a portion of this amount into a checking account that was in his name only, and another portion into a savings account that was in his name only. He also used some of the monies to pay off the debt on his and Wife's vehicles. In the same month, he used $20,000 to put a down payment on a separate residence for himself.[5] At the time he received the check, no divorce petition had been filed, and the parties were still living together in Munford, Tennessee.

### PROCEEDINGS BELOW

On May 25 and June 6, 2006, respectively, the parties filed cross-petitions for divorce, alleging as grounds irreconcilable differences and inappropriate marital conduct.

---

[4]The debt owed by the parties to the Stagners was not reduced to writing. Likewise, although the transfer of the property back to the Stagners was intended to relieve the parties of their debt to the Stagners, this cancellation of the debt was not in writing.

[5]He later put a new roof on the house that cost $5,000.

-4-

On October 16, 2007, the trial court conducted a bench trial. Husband, Wife, and church elder David Job ("Elder Job") testified at trial.[6] Elder Job testified first. He described the elders' meeting with the parties about the parties' marriage problems and the Kentucky property. He said that the discussion did not include details about the property transaction, but instead focused on resolving the parties' financial burden so that they could work out their marriage. He said that Wife did not want to move to Kentucky because she had a teaching career and a better support group in Tennessee. Elder Job indicated that he did not recall any discussion of whether Wife was willing to give the parties' substantial equity in the property to the Stagners. The parties were still living together at the time of the meeting, and Elder Job emphasized that the main focus was to reconcile the parties so that "they could just simply be together here [in Munford] as a family."

Wife testified at trial. She said that, before the parties moved to Tennessee, they lived in Camden County, Georgia. Wife taught school in Georgia for three years and became tenured; she had a small retirement fund from that job.[7] When the parties moved to Tennessee, Wife began teaching in the Tipton County School System; by the time of trial, she had been teaching there for almost six years. She became tenured in Tipton County after three years of teaching, and she also had a small retirement fund from that job.[8] Wife said that, several times during the marriage, she expressed to Husband her desire to obtain her master's degree, but Husband told her that they could not afford it. Wife estimated that her desired graduate education would cost between $15,000 and $25,000. Wife said that she had a monthly income of $3,398 from her teacher's salary. She also asserted that she was entitled to 48.3% of Husband's military retirement fund. Wife's reported expenses were just over $3,000 per month.

Wife testified that Husband did not consult with her before he and his father began looking for property in Kentucky. After they purchased the property, she stated, she and Husband began making interest payments to the Stagners. She claimed that she told Husband at that time that she was unsure whether she wanted to live in Kentucky, but Husband ignored her. Consequently, Wife said, she "just became quiet," and worked on building the Kentucky house to "keep the peace" in her family.

---

[6]Other witnesses also testified at trial, but none of them testified about matters related to the parties' property interests.

[7]At the time of trial, the Georgia fund was worth $5,616.

[8]At the time of trial, the Tennessee fund was worth $7,287.

Wife testified that, whenever the family had free time, such as on holidays and weekends, they would go to Kentucky to work on the house. She contributed by cleaning out the garage, picking up debris, mowing the grass, sanding floors, picking out paint colors and countertops, and performing various other tasks. Wife agreed that Husband performed 90% of the labor on the house, but added that she contributed by taking care of the children when Husband was in Kentucky working on the house.

Wife testified that Husband signed the necessary papers to consent to the mortgage on the house in Munford, Tennessee, but it was purchased in her name only. Wife explained that she purchased a home solely in her name because she and Husband had reached a stand off — as Husband's retirement approached, she refused to move to Kentucky, and Husband "was in no way, shape, or form looking for homes here in the area . . . ." Thus, so that she would not have to move to the house in Kentucky, Wife purchased the home in Munford. Wife said that Husband moved into the Munford house with her and the children.

Almost immediately after his retirement in June 2005, Wife stated, Husband moved to Kentucky to work on construction of the house until October 2005. During that time, she said, he did not provide financial support for her or the children. When she asked him for financial assistance, she said, Husband refused, telling her that she could afford to pay her own bills.[9] Even after Husband moved back into the Munford home in October 2005, Wife stated, he did not financially support the family. Husband was not receiving either a military or a school salary during that time, but he did receive about $2,000 per month in retirement and Veteran's Administration ("V.A.") disability benefits.

Wife testified that there was a lack of communication between Husband and her, particularly with respect to the Kentucky house. She said that Husband spent money on the Kentucky house without consulting her, and transferred money from the parties' joint checking and savings accounts without consulting her. Wife commented that "[e]veryone else knew things about the house . . . . [The Stagners] were privy to it. There were things being done without my knowledge." Wife testified that Mr. Stagner "kept very specific documents" detailing the amounts he expended on the house. She acknowledged that everyone involved intended for the Stagners to be repaid in full for the amounts they expended on the real estate and on the construction of the house.

Wife stated that, after the meeting with the church elders, she agreed to transfer the property back to the Stagners to cancel the parties' debt. Wife qualified this, however, by saying that she "knew [the property] was worth a lot of money," and she did not intend to gift the substantial equity in the property to the Stagners. Wife said that she wanted the Stagners to

---

[9]Husband paid the cable bill because it was in his name.

be repaid what they were owed, but she assumed that the equity in the home "was to come back to" her and Husband. When asked why she assumed this, Wife stated:

> [Wife]: I was never told specifically anything once I sold or signed the deed to the house. I was never included in on the sale of the house, I was never informed as to who the real estate company was, I was never informed as to how much the house sold for, I was never informed as to when the house actually sold, I was never informed as to when or how much the net profit for the house was until we met for the first time here in August '06.
> [Question]: Did you inquire of your husband of that?
> [Wife]: Several times.
> [Question]: Would he provide you that information?
> [Wife]: He refused to.
> [Question]: Did you ever intend to gift the equity in this property in any way to your father-in-law?
> [Wife]: No, I did not.

Later in her testimony, Wife indicated that Husband told her that the equity in the Kentucky house would go to her and Husband: "It was stated by [Husband] that the moneys [from the sale of the house] would pay his father off and then we in turn would get the money that was left from the home."

Wife testified that, in the course of going through some storage bins, she found copies of a new last will and testament and power of attorney executed by Husband in April 2005. In Husband's new will, Wife was excluded from Husband's estate. The power of attorney named Husband's sister as his attorney-in-fact.

Husband also testified at trial. At the time of trial, Husband was living in a house in Atoka, Tennessee, near Munford, teaching computer classes at a local middle school. In his teaching position, he earned $3,596.67 per month. At the time of trial, Husband was taking college classes to earn a degree in education to maintain his teaching position. Husband had been deemed 40% disabled from injuries he sustained while in the Navy,[10] and he earned a V.A. disability check of $605 per month, tax-exempt. He said that, since June 2005, he also had been receiving $1,258.69 per month in military retirement benefits.

According to Husband, before the Kentucky property was purchased, he and Wife discussed buying land and building a house in Kentucky. He acknowledged that Wife did not see the

---

[10]Husband stated that his injuries included a partial hearing loss, tinnitus (ringing in the ears), hypertension, and a knee injury.

property before they purchased it. Husband said that the plan was to move into the house in Kentucky before their daughter began high school, which would have been in the fall of 2006. From the time construction began in 2002 until the house sold in 2006, he frequently worked on construction of the house on weekends and during his free time. Sometimes, he said, Wife and the children would accompany him to Kentucky and work on the house. During the time period between June 2005 and October 2005, Husband said, he would typically work on the house during the week, stay with his parents, and return home to Tennessee on the weekends. During the time in which he was in Kentucky, Wife stayed home in Tennessee, worked at her job, and took care of the children.

Husband claimed that he first learned that Wife did not want to move to Kentucky in December 2004, when she told him "that there was no way she was moving to" Kentucky. By that time, he said, the house was partially completed — it had been bricked, and a roof and windows had been installed, but the kitchen cabinets had not yet been completed. Husband testified about the three options given to the parties by his father, Mr. Stagner. He conceded that Wife had no direct contact with Mr. Stagner about the matter, but said that he communicated to Wife everything that his father had said. After they discussed the options, they met with the church elders to try to make the right decision. At the time they met with the elders, Husband claimed the idea of moving to Kentucky had not been foreclosed. He still "thought [they] were going to move up there [to Kentucky] and be happily ever after." A couple of days later, however, they signed the deed transferring the property to his parents.

After the property was deeded to the Stagners, Husband spent a lot of time working to complete the house so that the Stagners could sell it for the full value of the property. Asked why he and Wife did not sell the property on their own, rather than transferring it to the Stagners for sale, Husband replied that the house was not ready to sell at the time the property was transferred.

Husband testified that, after the Kentucky house sold, he told Wife about the sale; he did not remember whether he disclosed to her the amount of the selling price. Husband said there was no agreement or understanding between him and Mr. Stagner about what would happen to the equity in the property if the deed were signed over to the Stagners, and said that the subject "never came up" between him and Wife, because she wanted nothing to do with the Kentucky house. Husband remarked that he was "a little shocked" when he received the $168,177 check in the mail from his parents after the sale. He testified that his parents paid taxes on the proceeds from the sale of the house, but he had no documents to corroborate that claim.

Husband stated that he put the $168,177 into two accounts at Patriot Bank, both in his name only. He used some of the money to buy his separate home and furniture, and some to pay

off the balance of the loans on the parties' vehicles. At the time of trial, Husband said, about $101,000 of the monies remained in one of the bank accounts at Patriot Bank. Since the parties' separation, Wife had been the children's primary residential parent, and Husband paid Wife $773 per month in child support.

Husband claimed that he never stopped Wife from pursuing her master's degree during the marriage. He said that she could have pursued it in their early marriage before the children were born, and later could have completed courses over the internet, but she never formulated a plan to attend school to obtain her degree. Husband said that the only time he told her that she could not enroll in classes was when they were trying to finish the construction on the house in Kentucky. He confirmed that the Navy paid for most of his post-graduate education. Contrary to Wife's testimony, Husband claimed that, when he was spending time in Kentucky between June 2005 and October 2005 finishing the house, he gave Wife money for household expenses. At the conclusion of the testimony, the trial court took the case under advisement.

On December 20, 2007, the trial court entered an order resolving many, but not all, of the issues in the case. Some of these initial findings of fact pertained to the Kentucky property. The trial court found that the Stagners "had contributed over $140,000 toward the construction of the Kentucky house," and that Husband and Wife both always intended that the Stagners would be repaid. At that time, when the Kentucky property was deeded to the Stagners, the trial court found, "[n]o one indicated what would happen with the equity in the property once it was sold." The trial court noted that the property was purchased during the marriage, the house was constructed during the marriage, and the money was loaned to the parties during the marriage; nothing in the record showed that the substantial equity in the property was intended to be a gift from the parties to the Stagners. Rather, the property was transferred to the Stagners for the purpose of ensuring that they would receive the money that they had loaned to the parties. Therefore, the trial court held that the $168,177 check the Stagners sent to Husband was marital property, and that it should be divided equally.

The trial court further awarded Wife a lump sum of $15,000 in rehabilitative alimony for her to use to obtain a master's degree. In addition, the trial court awarded Wife 48.3% of Husband's military retirement fund. Because Husband indicated that the amount of his retirement benefit might decrease in proportion to any increase in his V.A. disability benefits, the trial court awarded Wife nominal alimony *in futuro* of $1 per month, so that she could petition the court for additional alimony if the dollar amount of her share of Husband's retirement benefits was reduced. Wife was designated as the children's primary residential parent, and the parties were directed to prepare a permanent parenting plan and child support worksheet in accordance with their agreement.

On March 20, 2008, after a hearing on a motion filed by Wife, the trial court entered an order requiring Husband to produce additional bank statements, as well as documents relating to his V.A. disability income, his payments on the parties' vehicles, his tax returns, and his retirement benefits from the State school system. The parties were also required to obtain a title opinion regarding the status of the Kentucky property, in particular with respect to the ownership of the two remaining lots, Lot 17 and Lot 18. Wife later asked the trial court to conduct an additional evidentiary hearing, particularly in light of the results of the title search on Lots 17 and 18, and also on the additional documents produced by Husband. Wife also asked the trial court to resolve other remaining issues, such as Wife's entitlement to her proportionate share of the military retirement benefits received by Husband between the date of the divorce petition and the date of the final order, termed "retroactive" military retirement benefits.

On November 20, 2008, the trial court conducted another hearing in the matter. Husband was not present at the hearing, but he was represented by counsel. Wife testified at the hearing about facts gleaned from documents produced by Husband since the previous hearing. She testified about a Real Estate Disclosure Statement dated November 2, 2005, listing the Stagners as the seller of Lot 19, on which the house was situated, and also listing Husband as a seller and as the builder of the house. Wife also testified about deeds showing that Lots 17 and 18 had been transferred by Husband and her to the Stagners in May 2005; the deeds reflected that the Stagners paid $16,000 for Lot 17 and $8,000 for Lot 18. Wife testified that, contrary to the statement in the deeds, she never received any money from the transfer of Lots 17 and 18, and the Stagners apparently retained ownership in those two lots.

Consistent with his testimony at trial, the documents produced by Husband showed that after he received the $168,177 check from the Stagners, he deposited $40,000 into his checking account at Patriot Bank and $128,177 into a separate savings account at Patriot Bank. The records showed that Husband still had about $96,000 of these funds, which had been transferred to a money market bank account in November 2006.

In her testimony, Wife asserted that she was entitled to $20,261.91 in retroactive military retirement benefits received by Husband, which was 48.3% of the payments he had received from May 2006 through December 2008. Husband did not dispute the percentage amount or Wife's calculations, but he argued that it would be inequitable to award Wife retroactive retirement benefits in addition to the other monies awarded her by the trial court. Wife testified that she was taking two classes at Triveca Nazarene University at a cost of $2,500.[11] She said she anticipated graduating with a master's degree in December 2009, but claimed that she needed more money to do so.

---

[11]Wife testified that her father gave her $1,000 toward the Triveca tuition.

At the conclusion of the hearing, the trial court issued an oral ruling. Regarding Lots 17 and 18, the trial court held that the property was deeded to the Stagners to help the parties avoid financial trouble, but that it was never intended for these two lots "to go to them and just to have." Therefore, the trial court held, the property was being held by the Stagners in a resulting trust for the benefit of Husband and Wife, and that Wife was entitled to half the value of the property, or $12,000. The trial court also ruled on issues related to child support, tax credits, and other issues not relevant to this appeal. The trial court reserved its ruling on the pre-trial military retirement benefits claimed by Wife.

On January 8, 2009, the trial court entered an order determining that Wife was entitled to 48.3% of the retroactive military retirement benefits received by Husband from the time the petition for divorce was filed in May 2006 to December 2008. The parties agreed that $20,261.91 was the total amount due, and Husband was ordered to pay Wife $350 per month until the total amount was paid in full. Because this was the last remaining issue to be resolved, the trial court ordered the parties to submit a final decree of divorce and permanent parenting plan consistent with all of its prior rulings.

On April 14, 2009, the trial court issued a final decree of divorce and permanent parenting plan, essentially summarizing all of its previous rulings. The trial court found that the $168,177 check received by Husband from his parents for the sale of Lot 19 of the Kentucky property was marital property, but that there was no commingling of these funds by Husband. Accordingly, Husband was ordered to pay Wife $72,086.69 from this amount, representing half of the total amount minus the pay-off amount on Wife's vehicle and half of an expert's fee. The trial court further held that Lots 17 and 18 "that [were] owned by the parties which [are] presently in the name of husband's parents [are] subject to a Resulting Trust and/or the parties have equitable ownership of said property and that said property is marital property." Based on this finding, the trial court held that Husband owed Wife half of the purchase price of Lots 17 and 18, or $12,000. The final decree also included a provision requiring Husband to pay Wife lump-sum rehabilitation alimony of $15,000 and alimony *in futuro* of $1 per year. The decree awarded Wife $20,261.91 from the retroactive military retirement benefits received by Husband during the time period of May 2006 through December 2008, but subtracted from this amount $3,317 in child support overpayments and subtracted $1,904.82 from the netting of income tax liabilities, tax refunds, and interest income due to Wife. Therefore, Wife was awarded a total of $15,040.09 in retroactive military retirement benefits, to be paid at a rate of $350 per month. The trial court also awarded Wife 48.3% of Husband's prospective disposable retirement pay until the military separates the parties' respective shares and disburses it to them. Finally, the trial court resolved issues involving personal property and adopted a permanent parenting plan filed by the parties, which holdings are not at issue in this appeal.

On May 12, 2009, Husband filed a motion to alter or amend the final decree, claiming that the $168,177 payment to him from the sale of the Kentucky property was a gift to him from his parents and, therefore, constituted his separate property. In addition, Husband argued that Wife should not receive half of the purchase price on Lots 17 and 18, because there was no evidence that this purchase price was ever paid, or that Husband ever received any monies from this purchase beyond the $168,177 check from the Stagners. In addition, Husband asserted that the $15,000 lump-sum award of rehabilitative alimony to Wife is inequitable, because the trial court's distribution of the parties' various retirement accounts took into consideration the parties' education, and because the weight of the evidence did not support the payment of this amount for Wife's education. Husband also argued that awarding Wife the retroactive military retirement benefits was inequitable when considered in conjunction with the other awards made to Wife. On July 20, 2009, the trial court denied Husband's motion to alter or amend. Husband now appeals.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Husband raises the following issues:

> 1. Whether the trial court erred in finding that the $168,177 payment by the Stagners to Husband was marital property subject to equitable division?
> 2. Whether the trial court erred in determining that Lots 17 and 18 were being held by the Stagners in a resulting trust for the benefit of the parties and, consequently, in awarding Wife $12,000 as an equitable distribution of the value of that property?
> 3. Whether the trial court erred in awarding Wife $15,000 as lump-sum rehabilitative alimony?
> 4. Whether the trial court erred in awarding Wife $20,261.91 as an equitable distribution of Husband's retroactive military retirement payments received by Husband after the first divorce petition was filed in May 2006?

We review the decision of a trial court sitting without a jury *de novo* upon the record, accompanied by a presumption of correctness of the trial court's findings of fact, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); **Bogan v. Bogan**, 60 S.W.3d 721, 727 (Tenn. 2001). The trial court's conclusions of law are reviewed *de novo*, with no such presumption of correctness. **Union Carbide Corp. v. Huddleston**, 854 S.W.2d 87, 91 (Tenn. 1993).

The classification of property as either marital or separate property is a question of fact for the trial court. Therefore, we review such classification *de novo* on the record with a presumption of correctness in the trial court's finding. **See Mitts v. Mitts**, 39 S.W.3d 142,

144-45 (Tenn. Ct. App. 2000). A trial court is vested with broad discretion when exercising its duty to divide marital assets equitably in a divorce proceeding. **Flannery v. Flannery**, 121 S.W.3d 647, 650 (Tenn. 2003). Therefore, we will not disturb a trial court's division of the marital estate on appeal "unless the distribution lacks proper evidentiary support or results from an error of law or a misapplication of statutory requirements and procedures." **Thompson v. Thompson**, 797 S.W.2d 599, 604 (Tenn. Ct. App. 1990).

Facts warranting the imposition of a resulting trust must be proven by clear, cogent, and convincing evidence. **See Rowlett v. Guthrie**, 867 S.W.2d 732, 735 (Tenn. Ct. App. 1993). The "clear, cogent, and convincing" standard is "an intermediate standard more exacting than a preponderance of the evidence standard while at the same time not requiring the kind of certainty inherent in the criminal standard of proof beyond a reasonable doubt." **Estate of Acuff v. O'Linger**, 56 S.W.3d 527, 535 (Tenn. Ct. App. 2001). As explained in **Estate of Acuff**, "we must determine on appeal *de novo* whether or not [the proponents of the resulting trust have] proved their case by clear, cogent, and convincing evidence. The determinative question under this standard of review is whether or not [the proponents of the resulting trust] have carried the burden to establish that it 'is highly probable' that" the facts warrant the imposition of a resulting trust. **Id.** at 537.

A trial court has wide latitude in awarding alimony. **Owens v. Owens**, 241 S.W.3d 478, 490 (Tenn. Ct. App. 2007). An award of alimony depends on the circumstances of each case; in general, the primary considerations are the need of the recipient spouse and the obligor spouse's ability to pay. **See Burlew v. Burlew**, 40 S.W.3d 465, 472 (Tenn. 2001). In awarding alimony, the trial court must balance several factors, including those enumerated in Tennessee Code Annotated § 36-5-121. The alimony statutes indicate a legislative preference for rehabilitative alimony, but the type and amount of an alimony award remain within the discretion of the trial court. **Id.** at 470. This Court will not alter a trial court's award of alimony absent a finding of an abuse of discretion. **Id.**; **see also Bratton v. Bratton**, 136 S.W.3d 595, 605 (Tenn. 2004).

**ANALYSIS**

### 1. Classification of $168,177 Received from the Sale of Lot 19

We first address Husband's argument that the $168,177 sent to him by his parents is not marital property subject to equitable division. He argues that the circumstances surrounding the payment indicate that it was intended to be a gift to Husband from his parents and,

therefore, is his separate property.[12] He points out that he and Wife transferred the property to the Stagners without any reservation of rights. As a result, he contends, the Stagners had no legal obligation to give either Husband or Wife any of the equity in the property. In response, Wife argues that the $168,177 payment was made to Husband while the parties were still married and living together, and there was no evidence that Wife intended to gift to the Stagners her portion of the equity in the property. Rather, the evidence indicated that she intended only that the Stagners would be repaid fully for the amounts they loaned to her and Husband. Therefore, when the Stagners wrote Husband a check for the equity in the property, that equity constituted marital property.

In Tennessee, assets acquired during the parties' marriage are presumed to be marital property. **Woodward v. Woodward**, 240 S.W.3d 825, 828 (Tenn. Ct. App. 2007) (citing T.C.A. § 36-4-121(b)(1)(A)). This presumption may be rebutted by proof that the asset is actually the separate property of either spouse. **Id.** (citing **Dunlap v. Dunlap**, 996 S.W.2d 803, 814 (Tenn. Ct. App. 1998)). The burden of proof is on the party claiming that the property is his separate property.[13] **See Owens v. Owens**, 241 S.W.3d 478, 485-86 (Tenn. Ct. App. 2007). In this case, the trial court determined that Husband did not overcome the presumption that the money he received from the sale of the house was marital property. Husband bears the burden on appeal of showing that the preponderance of the evidence weighs against this finding. **See Bochette v. Bochette**, No. M2009-00113-COA-R3-CV, 2010 WL 366694, at *4 (Tenn. Ct. App. Feb. 2, 2010).

"The formal requirements of a gift are the intention by the donor to make a present gift coupled with the delivery of the subject of the gift by which complete dominion and control of the property is surrendered by the donor." **Hansel v. Hansel**, 939 S.W.2d 110, 112 (Tenn. Ct. App. 1996). The donee has the burden of proving the essential elements of a gift. **See In re Estate of Bligh**, 30 S.W.3d 319, 321 (Tenn. Ct. App. 2000).

---

[12]In his brief, Husband's position was based on the premise that the trial court had included the $168,177 check as part of the resulting trust. However, the trial court's holding with respect to Lot 19 was only on the ownership of the proceeds of the check that Husband received from his parents, and as such did not involve the issue of whether there was a resulting trust. At oral argument, Husband conceded that the $168,177 was classified as marital property based on factors not related to the resulting trust, and he adjusted his argument accordingly.

[13]By the same token, property acquired *before* the marriage is presumed to be *separate* property, and the party seeking to rebut this presumption must show that this separate property, either by transmutation or commingling, has become marital property. **See Daniel v. Daniel**, No. M2006-01579-COA-R3-CV, 2007 WL 3202778, at *5 (Tenn. Ct. App. Oct. 31, 2007) (citing T.C.A. § 36-4-121(b)(2) (2005)).

The evidence at trial showed that the transactions between Husband and Wife and the Stagners were very informal. Husband and Wife purchased the property with the intent that their family would build a house and settle there after Husband's retirement. To further this purpose, the Stagners willingly loaned Husband and Wife the money to purchase the property and build a house, at all times expecting to be repaid in total at some undetermined point in time. The loan was made without any formal loan documentation and without the placement of a lien on the property in favor of the Stagners. When the marital difficulties between Husband and Wife surfaced, the Stagners sought assurance that their loan would be repaid. To accomplish this, Husband and Wife transferred the property to the Stagners. Husband testified that he had no discussions with his father about the disposition of the substantial equity in the Kentucky property, and there is little evidence of any discussions between Husband and Wife on this topic. Wife first testified that she assumed that she and Husband would receive the equity in the property after the Stagners sold it, and then later testified that Husband told her that they would receive any equity in the property after their debt to the Stagners was satisfied. Wife asserted that she did not intend to gift her equity to the Stagners. Mr. Stagner did not testify at trial, but it is undisputed that his discussions regarding the Kentucky property were only with Husband.

Husband points to the fact that the $168,117 check was payable to him alone as evidence that the check was a gift to him. While pertinent, this fact is hardly determinative in the context of the overall evidence. The undisputed evidence at trial indicates clearly that the payment represents the equity in the property, as is evidenced by the amount of the check and the notation in the memo line that the check was for the "sale of house." The equity in the property accrued through the parties' joint efforts. Husband's efforts were direct, of course, in actually constructing the house. Although Wife did some minimal direct construction work on the house, her contributions were primarily indirect, by maintaining the family unit while Husband was away. The evidence showed that Husband worked very diligently to complete the construction of the house *after* it was transferred to the Stagners. He testified that he did so to realize the most money from the sale of Lot 19, but did not testify that his prodigious effort to complete the house was intended as a gift to his parents. It could be inferred from this that Husband understood that he still held some interest in the property, if only an expectation that he would be compensated for his "sweat equity." Furthermore, Wife testified that she did not intend to give her portion of the equity in the house to the Stagners, and that she assumed, either by Husband's comments or otherwise, that she and Husband would be given whatever proceeds were realized from the sale of the house after the Stagners were repaid in full. The trial court apparently credited Wife's testimony, and this Court must defer to the trial court's assessment of the credibility of the witnesses absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Given the informality of the dealings between these parties, and with due deference to the trial court's credibility determinations, the evidence supports the trial court's

-15-

finding that the payment to Husband was not simply a benevolent gift from his parents, but was in fact a payment for the equity in the property, which belonged to both Husband and Wife. Therefore, on this record, we must affirm the trial court's finding that Husband did not sufficiently rebut the presumption that the $168,177 check received by him from his parents during the marriage constituted marital property.

## 2. Resulting Trust For Lots 17 and 18

Husband next argues that the trial court erred in finding that Lots 17 and 18 were subject to a resulting trust in favor of Husband and Wife, and that, therefore, Husband was obligated to pay Wife half of the property's value. In finding that the property was subject to a resulting trust, the trial court recognized that, contrary to the recitation in the deeds that Lots 17 and 18 were transferred for a purchase price of $16,000 and $8,000, respectively, no money changed hands for the transfer of this property. It found, however, that Husband and Wife did not intend for the Stagners to "just have" Lots 17 and 18, but rather the Stagners were holding both lots for the benefit of Husband and Wife. On this basis, the trial court concluded, Wife was entitled to her equitable share of the proceeds from the transfer of this property, or $12,000.

On appeal, Husband argues that this finding was in error, because there is no evidence to establish that the Stagners were holding Lots 17 and 18 for the benefit of Husband and Wife. Rather, the Stagners accepted these lots in satisfaction of the debt for the loan to Husband and Wife to purchase the property in 2001. Therefore, he argues, the record does not establish the elements necessary for the imposition of a resulting trust. In response, Wife asserts that the trial court was "empowered to do what is reasonable under the circumstances," which included imposing a resulting trust on Lots 17 and 18 to allow her to share in the proceeds resulting from the transfer of those lots.

As noted above in the standard of review, facts warranting the imposition of a resulting trust must be proven by clear, cogent, and convincing evidence sufficient to overcome the evidence to the contrary. *See Rowlett*, 867 S.W.2d at 735. On appeal, we must determine whether the imposition of a resulting trust was warranted by the evidence, reviewing the record *de novo* and according no deference to the trial court's decision. *Estate of Acuff*, 56 S.W.3d at 537. "The determinative question under this standard of review is whether or not [the proponent of the resulting trust] ha[s] carried the burden to establish that it 'is highly probable' that" the facts warrant the imposition of a resulting trust. *Id.*

The Tennessee Supreme Court has recited the following comprehensive statement regarding the creation and application of resulting trusts:

The imposition of a resulting trust is an equitable remedy; the doctrine of resulting trust is invoked to prevent unjust enrichment. Such a trust is implied by law from the acts and conduct of the parties and the facts and circumstances which at the time exist and surround the transaction out of which it arises. Broadly speaking, a resulting trust arises from the nature or circumstances of consideration involved in a transaction whereby one person becomes invested with a legal title but is obligated in equity to hold his legal title for the benefit of another, the intention of the former to hold in trust for the latter being implied or presumed as a matter of law, although no intention to create or hold in trust has been manifested, expressly or by inference, and there ordinarily being no fraud or constructive fraud involved.

*Nichols v. Nichols* (*In re Estate of Nichols*), 856 S.W.2d 397, 401 (Tenn. 1993) (quoting 76 AM. JUR. 2d *Trusts* § 166 at 197-98 (1992)). Thus, the imposition of a resulting trust is appropriate where one party holds legal title to certain property, but that party is obligated in equity to hold the property for the benefit of another. Such a trust is justified if the facts and circumstances surrounding the transaction make it necessary to impose the trust to avoid unjust enrichment.

In this case, it is undisputed that Husband and Wife purchased Lots 17 and 18, along with Lot 19, and that they paid a total of $32,000 for all three lots. In May 2005, Husband and Wife transferred all three lots back to the Stagners in satisfaction of all amounts that the parties owed to the Stagners. There is little evidence in the record, however, to show the exact amount that Husband and Wife owed to the Stagners after the construction of the house on Lot 19. Additionally, the record is unclear as to whether the proceeds from the sale of Lot 19 retained by the Stagners constituted a repayment of the entire debt owed by Husband and Wife, including the amounts owed on Lots 17 and 18, or whether the amount the Stagners retained related only to the debt owed on Lot 19. The distinction is important as a matter of equity, because the evidence indicates that the transfer of the property from Husband and Wife to the Stagners in 2005 was intended only to secure the parties' debt, not to give the Stagners a windfall. If the amount of the sale proceeds retained by the Stagners covered only the debt on Lot 19, then Lots 17 and 18 were treated separately. If Lots 17 and 18 were treated separately, then the transfer of those lots to the Stagners simply satisfied the parties' debt to the Stagners on those properties, and Husband and Wife retained no equitable ownership in Lots 17 and 18.

From our review of the record, the evidence submitted to the trial court is simply incomplete with respect to the calculations necessary to make this determination. The record shows that Husband and Wife owed the Stagners the original purchase price of all three lots ($32,000). The record shows also that, for an undetermined period of time, Husband and Wife were

making monthly payments of $500 per month to the Stagners, but Husband's undisputed testimony was that these payments were for interest alone. Although the trial court found that the Stagners had provided "over $140,000" toward the construction of the house on Lot 19, the evidence on the amount the parties owed to the Stagners for construction costs is scant. Mr. Stagner reportedly kept detailed records of his monies the Stagners contributed toward construction, but none of those records were submitted into evidence. Thus, the evidence in the record indicates that Husband and Wife owed the Stagners a total upwards of $172,000.

The record reflects that the house on Lot 19 sold for $330,000. According to Husband, the Stagners paid taxes on the proceeds from the sale of the house, and there was no evidence to the contrary.[14] The record does not reflect the amount of any closing costs or attorney fees related to the sale of Lot 19, or whether the Stagners paid such costs.[15] Therefore, from the evidence in the record, the Stagners retained some $161,823 in proceeds from the sale of Lot 19 ($330,000 - $168,177), perhaps less taxes, closing costs, and attorney fees.

From this evidence, it appears that the amount of the sale proceeds the Stagners retained may not have fully satisfied the total debt by Husband and Wife owed to them for all three lots. If so, the amount retained by the Stagners represented satisfaction only of the amount Husband and Wife owed on Lot 19, not the total debt for all three lots. Under the circumstances, the Stagners would be entitled to the ownership of Lots 17 and 18 without the imposition of a resulting trust for the benefit of Husband and Wife, because the consideration for the transfer of Lots 17 and 18 was simply the cancellation of Husband and Wife's debt on those lots.

As noted by Wife, in the context of the parties' divorce, the trial court is vested with broad authority to do what is appropriate with the parties' property. This authority does not, however, extend to property owned by third parties. Once Husband and Wife voluntarily transferred ownership of Lots 17 and 18 to the Stagners, in consideration of cancellation of their acknowledged debt, the burden of proof was on Wife to show by clear, cogent and convincing evidence that the imposition of a resulting trust was warranted in equity. *See Rowlett*, 867 S.W.2d at 735. From our review of the record, the evidence does not meet this

---

[14]We presume Husband's testimony pertained to capital gains taxes.

[15]The deed on Lot 19 is included in the record on appeal; the record includes no closing documents from the sale.

standard. Therefore, we must reverse the trial court's imposition of a resulting trust on Lots 17 and 18 and its award to Wife of half of the value of that property.[16]

### 3. Rehabilitative Alimony of $15,000

Husband next argues that, in light of the trial court's findings that the $168,177 check constitutes marital property and that Wife is entitled to a $12,000 award from the resulting trust as to Lots 17 and 18, the $15,000 award of rehabilitative alimony is erroneous. He claims that these awards leave Wife with more than ample resources with which to pay for her pursuit of a master's degree if she so desires. Husband also emphasizes that Wife will receive a $3,300 per month salary from her teaching position, plus her share of Husband's military retirement fund, plus child support. With expenses of about $3,000 per month, Husband argues, Wife can well afford to pay the expense of obtaining her master's degree. Concomitantly, Husband argues that it will be difficult for him to pay this amount to Wife after he is forced to pay her $72,000 from his share of the sale proceeds on Lot 19 as well as $12,000 from the resulting trust on Lots 17 and 18. With only $96,000 in proceeds from Lot 19 remaining in his bank account, Husband argues, he clearly does not have the ability to pay Wife all of these amounts. Therefore, because Wife does not have needs that warrant the award of rehabilitative alimony, and he has insufficient ability to pay, Husband argues that the award or rehabilitative alimony should be reversed.

The trial court determined that Wife was entitled to the award of rehabilitative alimony to permit her to pursue her master's degree in light of the fact that Husband was able to acquire two post-graduate degrees during the marriage as a benefit of his military employment. In contrast, Wife's ability to obtain a graduate degree was hindered by the fact that she was often the sole caregiver for the parties' children while Husband was away on Naval duties or away working on the house in Kentucky. Husband acknowledged that, when Wife sought to obtain her master's degree during the latter part of the parties' marriage, Husband told her that they could not afford the expense at the time because the parties' disposable income was being directed toward the construction of the Kentucky house. Additionally, Husband's

---

[16]Although the issue was not raised by either of the parties, we must note that the trial court's jurisdiction to issue a ruling that would affect the Stagners' interest in Lots 17 and 18 is highly questionable. The property is located in Kentucky, and there is no indication in the record that the Tennessee trial court acquired *in rem* jurisdiction over it, or indeed that it could have acquired such jurisdiction. The Stagners, both Kentucky residents, were never made parties to the litigation and did not even testify. Moreover, with respect to Wife's claims regarding Lots 17 and 18, the Stagners would clearly be considered indispensable and necessary parties to any litigation that could potentially affect their real property interests. ***See Baker v. Foster***, No. W2009-00214-COA-R3-CV, 2010 WL 174773,a t *5 (Tenn. Ct. App. Jan. 20, 2010). Nevertheless, given our reversal fo the trial court's holding on Wife's claims to a resulting trust on Lots 17 and 18, we find it unnecessary to reach these issues.

argument that this award is unfair in light of distribution of the marital property generally is undercut somewhat by our reversal of the trial court's imposition of a resulting trust as to Lots 17 and 18. Under these circumstances, we find no abuse of the trial court's discretion in its award to Wife of $15,000 in rehabilitative alimony.

### 4. Retroactive Military Retirement Benefits

Finally, Husband argues that the trial court erred in awarding Wife $20,261.91 in retroactive military retirement benefits, payable to Wife in the amount of $350 per month.[17] Husband argues, however, that the trial court abused its discretion in making such an award in light of the other substantial amounts awarded to Wife. Husband also notes that he was not given credit for income taxes he paid on his military retirement benefits, as Wife's share was based on his total gross benefits before taxes. Husband also claims that this award was inequitable in light of the trial court's division of the other marital assets. He acknowledges that equitable division does not always mean equal division, citing *Bookout v. Bookout*, 954 S.W.2d 730 (Tenn. Ct. App. 1997), but argues that after consideration of the overall property division in this case, the award of retroactive military retirement benefits was inequitable.

Wife correctly notes that military retirement pay is marital property subject to equitable division. *Johnson v. Johnson*, 37 S.W.3d 892, 895 (Tenn. 2001). We note at the outset that the net amount of retroactive military retirement benefits awarded to Wife was adjusted to $15,040.09, after taking into account some adjustments for tax liabilities paid by Husband. Therefore, Husband's position that the award is inequitable because of the unfair tax burden was resolved by the trial court in this adjustment.[18] Moreover, Husband acknowledges that, during the time between the filing of the divorce petitions and the resolution of the proceedings below, he was not sharing with Wife any portion of the military retirement benefits he was receiving. Overall, we find no abuse of the trial court's discretion in its equitable division of the parties' marital property, and we affirm the trial court's award to Wife of her share of Husband's retroactive military retirement benefits.

---

[17]Husband does not dispute Wife's calculations on the retroactive military retirement benefits.

[18]The arguments made by the parties in the trial court regarding their relative tax liabilities were considered at length by the trial court. Husband does not argue that the trial court's calculations regarding his tax credit were incorrect.

**CONCLUSION**

The decision of the trial court is affirmed in part and reversed in part as set forth above. Costs on appeal are to be taxed equally to Appellant Phillip Wayne Stagner and his surety, and to Appellee Joanne Alice Brown Stagner, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE